# STATE OF MICHIGAN

# COURT OF APPEALS

MARSHA THOMAS, MICHAEL WOODCOCK, CINDY DELONG, RICHARD GUTE, MICHAEL GRAHAM, JAN GRAHAM, SALVATORE SCOZZARI, TIMOTHY TONER, PATRICIA TONER, GEORGE CUMMINGS, KELLY CUMMINGS, JOSEPH YOUNG, ELLEN YOUNG, MICHAEL KLUTZ, SHERYL KLUTZ, KENNETH PASSAGE, TONI PASSAGE, RICHARD HESS, DONALD SUIDA, CAROL SUIDA, PHILLIP STROPKE, SHARON STROPKE, LORENZO DIAZ, DICK VANWIEREN, DONNA VANWIEREN, DANIEL MITCHELL, JERRY MORROW, LYNDA HESS, THERESA TURNER, JAMES FIELDER, and DENISE FIELDER,

        Plaintiffs/Counter Defendants-
        Appellees/Cross-Appellants,

v

WHITE BIRCH LAKES RECREATION ASSOCIATION, ROBERT BRIGGS, TERESA STEPHENS, KEVIN DOMBROWSKI, MARY COX-PERKINS, STEVE BRYANT, and DAWN HOLZER,

        Defendants/Counter Plaintiffs-
        Appellants/Cross-Appellees.

UNPUBLISHED
June 9, 2015

No. 320382
Clare Circuit Court
LC No. 11-900526-CH

MARSHA THOMAS, MICHAEL WOODCOCK, CINDY DELONG, RICHARD GUTE, MICHAEL GRAHAM, JAN GRAHAM, SALVATORE M. SCOZZARI, TIMOTHY TONER, PATRICIA TONER, GEORGE CUMMINGS, KELLY CUMMINGS, JOSEPH YOUNG, ELLEN YOUNG, MICHAEL KLUTZ, SHERYL KLUTZ, KENNETH PASSAGE, TONI PASSAGE, RICHARD HESS, LYNDA HESS, THERESA

-1-

TURNER, JAMES FIELDER, DENISE
FIELDER, DONALD SUIDA, CAROL SUIDA,
PHILLIP STROPKE, SHARON STROPKE,
LORENZO DIAZ, DICK VANWIEREN,
DONNA VANWIEREN, DANIEL MITCHELL,
and JERRY MORROW,

    Plaintiffs/Counter Defendants-
    Appellants,

v

WHITE BIRCH LAKES RECREATION
ASSOCIATION, ROBERT BRIGGS, TERESA
STEPHENS, KEVIN DOMBROWSKI, MARY
COX-PERKINS, STEVE BRYANT, and DAWN
HOLZER,

    Defendants/Counter Plaintiffs-
    Appellees.

No. 322836
Clare Circuit Court
LC No. 11-900526-CH

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

These consolidated appeals arise from disputes over recreational uses of lots composing the several subdivisions of the White Birch Lakes Recreation Association ("the Association"). In docket no. 320382, defendants, who are the Association and several lot owners sympathetic to it, appeal as of right from the circuit court's orders insofar as the circuit court decreed that the Association had no authority under the pertinent covenants and restrictions, articles of incorporation, or association bylaws to promulgate rules restricting lot owners to one recreational vehicle per lot at a time. In docket no. 322836, plaintiffs (several other lot owners) challenge the circuit court's decisions requiring them to remove recreational vehicles from their lots on a seasonal basis, and rejecting their theory of discriminatory rulemaking or enforcement without benefit of an evidentiary hearing. Plaintiffs additionally assert that the circuit court acted capriciously and arbitrarily in issuing a final order that was not entirely consistent with certain earlier decisions. We affirm in both dockets.

## I. FACTS

Plaintiffs initiated this cause of action to prevent defendants from forcing the removal of plaintiffs' camping-related vehicles from their lots during the established off-season. At issue is interpretation of the Association's articles of incorporation, declaration of covenants and restrictions, and bylaws, and also an order resulting from earlier litigation.

Article I of the Association's bylaws, as amended in 2011, provides as follows:

-2-

The Association shall be responsible for the Management, Maintenance, Operations and Administration of the Common Properties and the affairs of the Development in accordance with the Declarations, these By-Laws, the Articles of Incorporation, duly adopted rules and regulations of the Association and applicable laws.

All Owners and other persons using or entering upon or acquiring any interest in any Lot or the Common Properties shall be subject to the provisions and terms set forth in the Declarations, these By-Laws, the Articles of Incorporation, the duly adopted rules and regulations of the Association and the laws of the State of Michigan.

The articles of incorporation provide that the Association was incorporated in 1978 "to promote pleasure, social, recreation and sports activities for its members . . . and to develop and maintain a recreationally oriented environment," and also to "make and perform any contract and to exercise all powers necessary incidental or convenient to the purposes set forth above." The articles further set forth the intent to "provide a means for the promulgation and enforcement of all regulations necessary to the governing of the use and enjoyment of such . . . recreational facilities or other amenities and such other recreational facilities within the Development as may be conveyed to the Association."

As the trial court noted, a "1988 court case involved a lawsuit by landowners of Subdivision 7 to enforce an amendment to their [covenants and restrictions] and have landowners remove their camping units from November 1, until the next Memorial Day weekend, limit lots to one camping unit and other concerns such as fire rings and setbacks." The parties settled that case, as reflected in an order which resolved the questions of seasonal placement of campers and related equipment in pertinent part as follows:

> [C]amping shall be allowed without the necessity of a permit each year from the beginning of the Memorial Day weekend through October 31, and at such other times during the year ("off-season camping") only in accordance with permits that may be issued by the Board of Directors of the [Association], the granting of such permits to not be unreasonably withheld, but which will not, in any event, permit off-season camping for any landowner for a duration of more than fourteen (14) consecutive days . . . .

The order further decreed that it would govern the issue unless and until the restrictive covenants were amended by appropriate process. As the instant circuit court noted, the 1988 court order "did not limit the number of camping units that could be put on a lot."

Also coming to bear is the Association's declaration of covenants and restrictions as amended in 2002, which incorporated the 1988 order with the following provision:

> Camping shall be allowed without the necessity of a permit each year from the beginning of Memorial Day weekend through October 31, and at such other times during the year ("off-season camping") only in accordance with permits issued by the Board of Directors of the [Association]. The granting of such

-3-

permits to not be unreasonably withheld, but which will not, in any event, permit off-season camping for any landowner for a duration of more than fourteen (14) consecutive days.

The amended covenants and restrictions do not expressly limit the number of camping units allowed on a lot.

Plaintiffs advise that the lots within the Association are generally large, some comprising more than an acre, and that some lot owners have houses on their lots, but most do not. According to plaintiffs, "For many decades, lot owners owning the 'vacant' parcels have placed trailer homes on their lots for single family residential use," and "the use of the lots for this purpose was always encouraged by the Association, and was a major marketing tool . . . to sell (and resell) the lots," but that disputes among lot owners concerning proper land uses arose before and after the 1988 settlement.

Plaintiffs commenced this action in November 2011, seeking declaratory and injunctive relief. Plaintiffs asserted that the Association's board of directors, "through . . . actions . . . including the adoption of resolutions or purported Board rules or policies, has undertaken actions which significantly and unlawfully restrict the property rights of the Plaintiff lot owners." Plaintiffs specified "unwarranted regulations, discriminatory application of same, improper imposition of fines," and "the requirement of unwarranted permits." Plaintiffs further complained that the board of directors "has undertaken discriminatory enforcement of rules or policies governing trailers and campers," including by having "required the outright removal of trailers and campers from lots on or by October 31 each year even though no covenants or restrictions, and no order of the Court . . . , require this or restrict the property owners from storing trailers or campers on their own lots throughout the entire year."

Defendants counterclaimed, seeking abatement of nuisance, injunctive relief, and declaratory relief confirming "the validity and enforceability of the Covenants and Restrictions applicable to the Development as well as the right for the board of the . . . Association to enforce such Covenants and Restrictions through the implementation of reasonable rules and regulations." Among the latter was a bulletin setting forth camping and fire pit regulations, which advised that "Only 1 camper unit is permitted on a . . . Lot," but that a second such unit "may be permitted for a maximum of 14 days if a permit is obtained from the [Association's] office."

The circuit court entertained arguments on cross-motions for summary disposition in May 2013, at the end of which the court stated as follows:

[I]t's long been . . . established that the property owners can join together and do a development and restrict certain property rights, and that's what happened here.

The other aspect is . . . the law has always said that [covenants] and restrictions are to be construed strictly against those creating and enforcing 'em.

And so . . . the ultimate question is . . . what is the power of the board? The power of the board is derived through their articles of incorporation and

-4-

through the [covenants] and restrictions, and [the articles of incorporation] provide a means for the promulgation and enforcement of all regulations necessary to the governing of the use and enjoyment and public safety of such . . . recreational facilities or other amenities and such other recreational facilities within the development as may be conveyed to the association.

I don't see anywhere in there where they were given the authority to make regulations regarding camping on lots.

. . . [T]here's nothing in the restrictions on camping that says the board can promulgate any rules regarding camping other than what's in that section.

There is no authority there.

. . . [T]here's no specific power given and you want to claim that there's an implied power.

The court elaborated:

If they want to put in camping restrictions then they should probably go ahead and amend your [covenants] and restrictions to specifically give 'em that authority, but the way I read the [covenants] and restrictions they don't have that authority unless you take it by implication, and I don't read the case law to say that you take something by implication to give them the authority to do it.

The circuit court further stated, "if there are any discriminatory actions in the plaintiff's [sic] complaints then they need to be dealt with individually . . . . So if there is anything in there then we are gonna continue this case and hold the trial on those discriminatory regulations—actions individually."

An order followed on August 14, 2013, styled as "partially" granting plaintiffs' motion for summary disposition and denying that of defendants. The order stated that plaintiffs' motion was granted "insofar as the Court has held that the Board of [the] Association has no express authority under the Association's Covenants and Restrictions, Articles of Incorporation or Bylaws to create regulations regarding camping that are not expressly contained in those documents."

Plaintiffs followed with a motion for declaratory ruling and permanent injunction, and defendants followed with a new motion for summary disposition. At the hearing on the motions the circuit court stated, "Well I want to make it pretty clear my ruling was really limited . . . to saying that their regulations that they issued weren't enforceable and they didn't have the authority to issue those regulations. I really tried to narrow my focus of that ruling." The circuit court added, "I ruled that they did not have an authority to make . . . regulations on camping . . . [a]nd so I didn't rule that . . . they couldn't limit it to one because . . . I never approached that issue." The circuit court further stated that interpretation of the covenants and restrictions remained a matter in issue.

Plaintiffs' attorney argued that plaintiffs' camping activities in fact comported with the single-family residential purpose, and also that plaintiffs were the victims of discriminatory or disparate treatment on the ground that "some of the defendants who are persons with a permanent residence on their property are using their property to also contain trailers and they don't limit themselves to one trailer and they don't require their trailer to be removed in the offseason." The circuit court took the matter under advisement to review the 1988 case to "see what in the heck occurred in that case and how they came to a settlement."

When proceedings resumed, plaintiffs' attorney requested an evidentiary hearing to resolve matters not yet decided, specifying "the issue concerning discriminatory treatment of sheds and decks relative to the lots in which there are no permanent structures," and asserted that the Association had authorized sheds and decks for some, but not all, lot owners, and argued that it had done so with "no standards applicable to who gets such approval and who does not." Counsel for defendants retorted that there is no cause of action for discriminatory enforcement in connection with private, as opposed to governmental, entities, and suggested that recognition of that principle should obviate any need for an evidentiary hearing.

The circuit court ruled as follows:

[O]n this matter I did make a prior ruling, it was a very limited ruling and based on information I have in front of me of this vague restrictions and covenant amendment and settlement from the 1988 case and originally this case was filed to stop White Birch from making lot owners remove their campers from their lots and also regarding discriminatory treatment regarding the sheds and decks, you really haven't shown any case law that would allow you to have a due process argument against [the Association] regarding discriminatory enforcement and without some kind of case law that allows that kind of a lawsuit I'm going to have to grant summary disposition to [defendants] on that.

. . . [Y]ou give up some of the property rights by buying into an association which has restrictions and [covenants].

Because the documents were so vague the Court did pull out the 1988 file, very interesting, . . . what happened is that the lot owners of . . . Subdivision seven didn't like campers being out on the lots, so the lot owners all added their own restrictive [covenants] and conditions regarding camping and temporary structures and then they filed that lawsuit to make people remove their trailers/campers from the lots. . . . [T]he attorneys and the judge approved some poor language in that settlement and . . . it would have been awfully easy for them to write in there that you can't store campers on your lots, but they didn't, they came out with their settlement agreement which talked about camping from May to October 31st and then by permit for the rest of the year.

When I was dealing with the language in my first ruling, . . . I'm looking at it strictly . . . because it never said that . . . you can't store campers on there . . . .

But now looking at the facts that 1988, [the Association] sued to make people remove their campers and then here we go 25 years we have lot owners suing to try and keep their campers on the lots to stop [the Association] from removing the campers from the lots.

I think that gives me a clear indication that the settlement of the 1988 case was . . . that you can't store campers on the lots.

It's too bad they just didn't come out and write that in there, but what they did do is they said from May to October 31st, you can camp there without a permit and thereafter you have to have permit.

The implication would be that you can't store it there and based on the facts from the 1988 case of what occurred . . . the Court's gonna take [the] implication because this is so poorly worded you could easily say the implication was . . . that you didn't need a permit you could store your camper there but if it wanted to use it you had to have a permit to do it.

* * *

But when you put in the facts of the 1988 case why it was done, . . . nobody can conclude . . . other than campers cannot be stored on the lots.

So the Court is granting summary disposition to [defendants] on all counts.

The circuit court continued, "I want to stress . . . that [in] 1988 one of the complaints . . . was no more than one campers [sic] could be one [sic] a lot and that language was not included in the settlement, so . . . it's not included in these restrictions." Accordingly, the circuit court held that "you can still have more than one camper on your lot." When plaintiffs' attorney showed some exasperation over the circuit court's apparent change of heart, the court explained, "I'm going back in modifying, my, my prior ruling was very limited . . . ."

A written order followed on January 28, 2014, which included the following:

It is clear to this court in reviewing the 1988 case that [the resulting order's] language meant that camping units would be removed in the off-season unless being used for camping by permit. This clause mandates that the . . . lots shall not be used for storage of recreational vehicles, campers, trailers or other camping accessories from November 1 through the next Memorial Day weekend. During this off-season period, all recreational vehicles, campers, trailers or other camping accessories shall be physically removed from any landowner's lot, absent a permit issued by the Association Board and their use for camping purposes. Off-season camping permits should not be issued for the purpose of storage of recreational vehicles, campers, trailers or other camping accessories.

-7-

The order further decreed that defendants' motion for summary disposition "related to removal of campers and trailers from October 31 through the next . . . Memorial Day weekend is granted," but that the motion as it related to defendant's desire to "limit camping and usage of recreational vehicles, campers, trailers or other camping accessories to one recreational vehicle, camper, or trailer per lot is denied." The order denied plaintiffs' request for an evidentiary hearing, and dismissed the attendant claim of discriminatory rulemaking or enforcement, on the grounds that "[t]here is no governmental action in this case. It is a private association that plaintiffs voluntarily joined."

These appeals followed.

This Court reviews a trial court's decision on a motion for summary disposition de novo as a question of law. *Ardt v Titan Ins Co*, 233 Mich App 685, 688; 593 NW2d 215 (1999). Likewise, "[t]he interpretation of restrictive covenants is a question of law that this Court reviews de novo." *Johnson Family Ltd v White Pine Wireless, LLC*, 281 Mich App 364, 389; 761 NW2d 353 (2008).

## II. DOCKET NO. 320382

### A. LIMITATION OF CAMPING UNITS PER LOT

Not at issue is that plaintiffs took title to their lots subject to a requirement to abide by the Association's policies and rules concerning land uses. Covenants applicable to a subdivision "are, in nature, reciprocal negative easements." *Northwestern Home Owners' Ass'n v Sheehan*, 310 Mich 188, 192; 16 NW2d 712 (1944) (internal quotation marks and citations omitted). "[T]he rationale of the doctrine of reciprocal negative easements is based upon the fairness inherent in placing uniform restrictions upon the use of all lots similarly situated . . . ." *Civic Ass'n of Hammond Lake v Hammond Lake Estates No 3 Lots 126-135*, 271 Mich App 130, 137; 721 NW2d 801 (2006) (internal quotation marks and citation omitted).

In this case, defendants cite provisions of the articles of incorporation and covenants and restrictions that set forth the objective of single-family residential character, and also the Association's duty to promote that character, and insist that "[b]ecause such broad authority was granted, specific delineation of categories of rules is simply unnecessary." Defendants thus assert that the Association has the authority to restrict lot uses to a single camping vehicle at a time by implication arising from the general provisions of the governing documents.

The circuit court, however, emphasized its understanding of a duty to avoid recognizing such implied covenants. The circuit court has statutory law on its side: "No covenant shall be implied in any conveyance of real estate, except oil and gas leases, whether such conveyance contain special covenants or not." MCL 565.5. This Court has held that "covenants would be implied only where the implication must arise from the language used or was indispensable to effectuate the intention of the parties . . . ." *Bobenal Investment, Inc v Giant Super Markets, Inc*, 79 Mich App 31, 40; 260 NW2d 915 (1977) (internal quotation marks and citation omitted).

Defendants protest that, without limitations in place, there would be nothing to stop a lot owner from loading up his property with ten camping-related vehicles, raising the specter of

several such lot owners creating the feel of a trailer park in obvious contravention of the well-established single-family residential character of the development. However, the circuit court's ruling that the governing documents do not authorize the Association to limit lots to a single such vehicle each does not mean that no degree of crowding of camping-related vehicles onto a lot lay within the Association's regulatory reach. The circuit court determined *only* that the single-family residential character of the development, as clearly set forth in the governing documents, was not necessarily defeated by allowing more than a single such vehicle on a lot; the circuit court did not decree that no density of such vehicles could ever produce that effect. Accordingly, the circuit court's determination that the governing documents did not authorize the Association to limit each lot to a single camping vehicle otherwise left open the question of how great a proliferation of such vehicles would sufficiently contravene the governing documents' provisions for single-family residential character that those provisions themselves would in fact authorize the Association to take steps remediate the situation. Thus, defendants fail to show that the circuit court erred in holding that the Association lacked authority under the relevant documents to limit lot owners to a single camping-related vehicle per lot.

## III. DOCKET NO. 322836

### A. SEASONAL PLACEMENT OF CAMPING-RELATED EQUIPMENT

Plaintiffs argue that "all landowners pay the same annual assessments to support the Association, with equal voting rights," but that defendants treat themselves as "a separate elitist class where they, or their favored 'insiders,' may place multiple trailers, year-around, on their property, while denying the same property rights to other property owners such as Plaintiffs." Plaintiffs acknowledge as a major basis for the different treatment is that some lot owners "have built a 'house' (even if it is only occupied in the summer)" while others are " 'mere land-owners,' " meaning owners of lots without residential dwellings, "who wish to use their property to place their trailer homes on their property." Plaintiffs additionally assert that the Association "has been applying and enforcing the . . . Covenants and Restrictions in an arbitrary [and] discriminatory manner, including by "allowing 'sheds or decks' for some vacant lot owners and not others."

Concerning seasonal, as opposed to year-round placement of house trailers or camping vehicles on the lots, plaintiffs do not dispute the circuit court's statements concerning the nature of the litigation that resulted in the 1988 order. Taking guidance from that earlier litigation, the circuit court concluded that the 1988 order's provisions concerning camping, as incorporated into the amended covenants and restrictions that followed, "meant that camping units would be removed in the off-season unless being used for camping by permit," in other words that the "lots shall not be used for storage of recreational vehicles, campers, trailers or other camping accessories from November 1 through the next Memorial Day weekend" and that "[d]uring this off-season period, all recreational vehicles, campers, trailers or other camping accessories shall be physically removed from any landowner's lot, absent a permit."

The circuit court's reasoning was sound. The distinction between the on- and off-season would mean little to those concerned with preserving the single-family residential character of the development if it meant that camping equipment on the lots would remain year-round, with

the only seasonal difference being that such equipment would be more conservatively used during the off-season. The circuit court reasonably concluded that the parties settled the 1988 litigation with the understanding that the development would feature substantially unfettered camping activities during the specified camping season, then would be substantially uncluttered with camping equipment during the specified off-season.

The differentiation between lots with and without residential dwellings reasonably reflects the single-family residential purpose of the development. A lot with a house on it obviously comports with the single-family residential aspiration of the development, and continues to emanate single-family residential character even if storing a trailer or other camping equipment thereupon year-round. Not so a lot that has no anchoring residential dwelling but that is loaded with equipment for camping, which activity differs from the purely residential by involving "people . . . temporarily lodged in tents, huts, or other makeshift shelters," or "more or less permanent . . . shelters[] used for vacationing or other recreational purposes." *American Heritage Dictionary* (2d college ed, 1985), p 232.

Article II, § B of the amended covenants and restrictions is instructive as another manifestation of the differentiation between lots with and without residential dwellings:

> No accessory outbuildings shall be erected on any of said lots prior to the erection thereon of a single-family dwelling house. In no event shall any such accessory outbuilding or temporary structure which may be constructed upon such lot under these restrictions ever be used as a residence or dwelling house or place of human occupancy or habitation.

Thus, lots with residential dwellings are given the privilege of accessory outbuildings.

For these reasons, the Association has engaged in no pernicious discrimination by recognizing that lots with residential dwellings can retain their single-family residential character after constructing attendant sheds or decks, or while storing recreational equipment, in ways that lots lacking residential dwellings cannot.

## B. DISCRIMINATORY RULEMAKING OR ENFORCEMENT

The circuit court summarily disposed of plaintiffs' claims of discrimination by pointing out that the constitutional Equal Protection doctrine is a guard against only governmental, not private, action, and noting that plaintiffs "have shown no law in support of their position." On appeal, plaintiffs take pains to disclaim that they are trying to apply constitutional rules in this litigation between private parties, but argue nonetheless that the Association violated its own principles by creating two classes of lot owners as a consequence of its decisions on applications for permits for trailers, sheds and decks.

However, plaintiffs do not suggest that this alleged creation of two classes resulted even in part from any differentiation by race, religion, age, or any other characteristic that establishes invidious discrimination against a class, and do not dispute the circuit court's assertion that they presented it with no legal authority for the proposition that the discretionary approvals, or withholding thereof, of which they complain constitute actionable discrimination. Nor do

-10-

plaintiffs offer such authority on appeal, but for citing, apparently for the first time, the following two provisions from MCL 450.2304, which is part of the Nonprofit Corporation Act:[1]

> (2) A corporation organized on a membership basis may have 1 or more classes of members. Except as otherwise provided in this act, any provision for classes of members and the relative number, voting rights, qualifications, liquidation rights, preferences, and limitations, and other rights, preferences, and limitations of or on each class shall be set forth in the articles of incorporation or the bylaws. Each member of any class of members has equal rights with all members of that class.
>
> (3) Except as provided in the articles of incorporation or bylaws, each member of a corporation, regardless of class, is entitled to 1 vote on each matter submitted to a vote of members, unless the articles of incorporation or bylaws deny, limit, or otherwise prescribe the voting rights of any class of members. The members and each affected class of members of a corporation organized on a membership basis, if any, shall adopt, amend, or repeal any bylaw denying, limiting, or otherwise prescribing the voting rights of any class of members.

However, plaintiffs neither set forth the factual particulars of how any such permitting or enforcement decisions on the Association's part went beyond normal discretion and created distinct classes of advantaged and disadvantaged lot owners for purposes of the Nonprofit Corporation Act, nor cite authority to aid in identifying such actionable private discrimination. See *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority."). Plaintiffs have failed to show that the circuit court erred in granting defendants summary disposition of their claim of unlawful discrimination.

## C. CAPRICIOUS AND ARBITRARY JUDGMENT

Plaintiffs argue that to the extent that the circuit court's order of January 28, 2014, and its statements from the bench leading up to it, was not consistent with its order of August 14, 2013, and statements leading up to it, the circuit court erred for having acted capriciously and arbitrarily. Plaintiffs direct this argument at the circuit court's ultimate conclusions, respectively, that defendants were entitled to insist on removal of plaintiffs' camping equipment during the off-season when not in use, and that no evidentiary hearing was required to decide the claim of discriminatory rulemaking and enforcement.

However, the rule for present purposes remains that "an order entered by a trial court may be modified before entry of the final judgment," and that among the reasons a court may do so

---

[1] MCL 450.2101 *et seq.*

for is "to reflect a more correct adjudication of the rights and liabilities of the litigants." *Meagher v Wayne State Univ*, 222 Mich App 700, 718; 565 NW2d 401 (1997).

Moreover, the circuit court in this instance did have a reasoned basis for issuing a final order that departed in some respects from its innuendos from earlier in the case. The circuit court initially deemed it a "big problem" that the governing documents did not grant the Association's board "the authority to make regulations regarding camping on lots," and its August 14, 2013, order in turn stated that "the Board of [the] Association has no express authority under the Association's Covenants and Restrictions, Articles of Incorporation or Bylaws to create regulations regarding camping that are not expressly contained in those documents." In later proceedings in the case, however, the court repeatedly reminded plaintiffs that this ruling was "very limited," and also that it had undertaken to review the litigation underlying the 1988 court order reflecting the parties' settlement. Only upon having advised itself of the nature and outcome of that earlier litigation did the circuit court conclude defendants could properly insist on removal of such equipment when not in use by permit during the off-season as a prerogative that inhered in the 1998 settlement order, regardless of the lack of the specification of such authority in the articles of incorporation, the covenants and restrictions, or the bylaws. This evolution in the circuit court's thinking was not arbitrary or capricious.

Likewise that the circuit court initially signaled the intention to decide plaintiffs' discrimination claim on an individual basis through separate trial proceedings, but then concluded that that claim should be dismissed on the basis of the legal authority presented to it. The circuit court did not act arbitrarily or capriciously in initially supposing that any claims of wrongful discrimination would have to be decided on the basis of what the evidence indicated in connection with each such claimant, and then to determine that any such claims failed on the basis of the legal authority, or lack thereof, presented by the parties.

For these reasons, plaintiffs fail to show that the circuit court erred in issuing a final order that departed from some of the impressions the circuit court communicated in connection with earlier proceedings.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto