*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEARBORN HILLS CIVIC ASSOCIATION, INC,

Plaintiff-Appellant,

v

FAWZIEH BITTAR and ACHRAF HOUEIDI,

Defendants-Appellees.

UNPUBLISHED
November 20, 2025
2:20 PM

Nos. 367782
Wayne Circuit Court
LC No. 21-009017-CH

---

DEARBORN HILLS CIVIC ASSOCIATION, INC,

Plaintiff-Appellant,

v

FAWZIEH BITTAR,

Defendant-Appellee.

No. 367857
Wayne Circuit Court
LC No. 22-005596-CH

---

Before: RIORDAN, P.J., and WALLACE and TREBILCOCK, JJ.

PER CURIAM.

The stucco siding of defendants' Tudor-style house was failing, so they began replacing it with cedar. That drew plaintiff's attention as being out of compliance with the development's deed restrictions. Defendants immediately stopped work and the parties attempted to find an agreeable solution. After they were unable to do so, plaintiff filed suit to enforce the deed restrictions, and defendants voluntarily removed the cedar siding during its pendency. The trial court ultimately found no deed-restriction violations, and granted summary disposition in defendants' favor on plaintiff's claims and in plaintiff's favor on the counterclaims. Because the trial court erroneously concluded defendants did not alter their home by adding the cedar siding without plaintiff's approval as required by the deed restrictions, we vacate that aspect of the trial court's judgment. We affirm in all other respects.

-1-

## I.  STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.

Defendants Achraf Houeidi and Fawzieh Bittar (husband and wife, collectively, defendants) own a house on Fairmount Drive in Dearborn.  Being located in Hannan's Dearborn Hills Subdivision No. 4, the property is subject to certain deed restrictions.  Three Articles are of importance to this appeal.

First, Article II sets forth a pre-approval process for alterations to buildings within the subdivision:

> No building shall be . . . altered . . . until the building plans, specifications, and plot plan showing the location of such building have been approved in writing by the Dearborn Hills Civic Association [(DHCA)] or by a representative designated by said Association for conformity and harmony of external design with existing structures in said subdivisions . . . .

Second, Article VI's "Character and Value of Buildings" provision dictates what materials must be used for exteriors:

> All buildings shall be constructed of stone, brick or stucco exterior.  A wood exterior may be used providing same has been approved in detail in writing by the [DHCA] or its designated representative as provided for in Article II hereof.

And it imposes certain building timelines:

> The construction of all buildings started in said subdivisions shall be carried forward to completion with reasonable promptness.  In the event that any building in said subdivisions is damaged or destroyed by fire or other casualty, the said building shall either be repaired or removed within a period of four (4) months after such occurrence.

Finally, Article XII discusses what other property owners may do upon a violation of the deed restrictions:

> If [a property owner] . . . violate[s] or attempt[s] to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated in [the] development or subdivisions to prosecute any proceedings at law or in equity against such covenant and either to prevent him or them from so doing or to recover damages or other dues for such violation.

Now to defendants' house.  In the spring of 2021, they began replacing its stucco siding—starting with its street-facing upper portion—because it was both rotted and damaged by woodpeckers.  Doing so was problematic for two reasons: defendants had not sought preapproval from DHCA as required by Article II, and they used cedar instead of stucco.  So, on the day that DHCA discovered the issue, it issued defendants a cease and desist letter.

That began a series of escalating interactions between the parties wherein defendants sought "review and approval" of the project and indicated that they would "cease further action" until they received approval. One part of that back-and-forth was defendants submitting to DHCA an "Architectural Plan Review Request Form" (DHCA refers to this as "the Plan Review Contract"), which DHCA uses for homeowners "to request the approval of [certain] alterations to lots or to the exterior of structures." It provides: "Owner acceptance and assurance to fully comply with the DHCA approved plans and any conditions of approval: I (we) agree to complete the proposed project in full accord to the DHCA approved plans, including any stated conditions for that approval."

DHCA eventually denied the proposed plans, concluding they were "of a contemporary design . . . not in conformity or harmony with the traditional designs of the homes in Dearborn Hills and also do not conform to the traditional Tudor style of [the] house and as such violate Article II of the Deed Restrictions." Of specific concern to the DHCA was defendants' use of cedar, which was not "consistent with the Tudor-style of the home." That denial led to more discussions between the parties to try to find a way to draft conforming plans to no avail.

B.

With the parties unable to resolve their differences, DHCA commenced this litigation. The operative complaint—filed as two separate actions in the trial court (for reasons unimportant here)—pleads seven counts: breach of Article II's prior-approval mandate (count one); breach of Article II's conformity and harmony mandate (count two); anticipatory breach of Article II's deed restrictions (count three); breach of Article VI's reasonable promptness requirement (count four); breach of contract (count five); promissory estoppel (count six); and fraud (count seven). Defendant Bittar counterclaimed, asserting abuse of process, fraud, and conversion. During the litigation, defendants voluntarily removed the cedar siding.

Following discovery, the trial court resolved numerous pending motions for summary disposition and sanctions filed by both parties in each action in one written opinion and order. That order dismissed all claims, granting summary disposition in defendants' favor regarding DHCA's claims, and summary disposition in DHCA's favor regarding the counterclaims. The trial court denied DHCA's motion for reconsideration. DHCA appeals by right in both matters, which this Court consolidated for administrative efficiency.

II. DHCA'S STANDING

We first consider whether DHCA has standing in this litigation. Article XII of the deed restrictions governing the disposition of this case provides a cause of action to "any other person or persons owning any real property" within the subdivision for deed restriction violations by others. In defendants' view, this means DHCA—a voluntary association that does not own any land in the subdivision—cannot sue to enforce the deed restrictions. On de novo review of the trial court's rejection of that argument, *Groves v Dep't of Corrections*, 295 Mich App 1, 4; 811 NW2d 563 (2011), we too conclude defendants' no-standing contention is without merit.

Under *Civic Ass'n of Hammond Lake Estates v Hammond Lake Estates No 3 Lots 126-135*, DHCA has standing to enforce deed restrictions on behalf of the property owners it represents,

despite not owning land. 271 Mich App 130, 134-135; 721 NW2d 801 (2006). Defendants acknowledge *Hammond Lake*, but argue our Supreme Court's subsequent decision in *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206; 737 NW2d 670 (2007), commands a reading to the contrary. Although not entirely clear, they appear to rely on the Supreme Court noting that courts must "enforce [a] deed restriction as written. . . ." *Id.* at 214. But nothing in that general principal-of-law statement about deed-restriction interpretation gives us license to set aside *Hammond Lake*'s organizational-standing holding (which *Bloomfield Estates* did not address). Moreover, this Court has continued to follow *Hammond Lake* post-*Bloomfield Estates*. See, e.g., *Franklin Commons, LLC v Helman Woods Subdivision Homeowners Ass'n*, unpublished per curiam opinion of the Court of Appeals, issued Nov. 5, 2010 (Docket No. 292952), p 2-3. Defendants' challenge to DHCA's standing is, therefore, without merit.

### III. DEED RESTRICTION CLAIMS

The main issues on appeal concern the trial court's resolution of DHCA's claims for defendants' failure to obtain preapproval (Article II), erecting a nonconforming structure (Article II), and not completing the project within a reasonable time (Article VI). "Courts review restrictive covenants with a special focus on determining the restrictor's intent." *Thiel v Goyings*, 504 Mich 484, 496; 939 NW2d 152 (2019). To do so, courts must read "the covenants 'as a whole rather than from isolated words. . . .' " *Id.* (citation omitted). Although unambiguous restrictions must be enforced "as written, . . . any uncertainty or doubt must be resolved in favor of the free use of property." *Id.* at 158. The trial court found no violations of the deed restrictions when it granted summary disposition in defendants' favor, and this Court reviews that decision de novo. *Jostock v Mayfield Twp*, 513 Mich 360, 368; 15 NW2d 552 (2024).

### A. ARTICLE II

Two parts of DHCA's claim of appeal concern Article II—its preclearance requirement and its conformity and harmony requirement. Each are addressed in turn.

### 1. PRECLEARANCE REQUIREMENT (COUNT ONE)

We begin with the trial court's summary-disposition grant in defendants' favor on DHCA's claim that defendants violated the deed restrictions by altering their house without prior approval.

Utilizing a dictionary's definition, the trial court defined "alter" as to "change or cause to change in character or composition, typically in a comparatively small but significant way." The parties do not contest this definition and for good reason, as it accords with the commonly understood meaning of the term. See *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 534; 676 NW2d 616 (2004). And under this meaning, we disagree with the trial court's conclusion that defendants did not alter their home merely because, in the trial court's words, they "applied the cedar siding to only 30% of one side of their home," which "was able to be removed on one day." To the contrary, the installation of cedar siding both significantly changed the house's "character" (bright siding on the front of the house instead of dark accent beams over light stucco) and its "composition" (cedar wood instead of stucco and brick). This constitutes an alteration under Article II, and defendants thus were required to seek approval from DHCA before commencing

-4-

their project. Because they admittedly did not do so, they violated Article II's preapproval requirement.

It is true that defendants' alteration was "comparatively small" in that only a portion of one side of the house received cedar siding, but that does not make it any less "significant." As the pictures in the record depicting the siding's appearance demonstrate, placing cedar on the front of the house starkly contrasts with the rest of its Tudor character, and runs counter to Article VI's mandate that exteriors be made of "stone, brick, or stucco" and that wood may be used only if approved in advance by DHCA. That it took less than a day to restore the Tudor appearance is of no moment for doing so cost tens of thousands of dollars, thus reflecting how significant the alteration was. Finally, we are not persuaded that defendants' removal of the siding changes this analysis or renders moot this appeal, as they still "altered" their house without preapproval and thus DHCA can obtain relief in the form of at least damages and declaratory relief.

For these reasons, we vacate the trial court's judgment and remand for it to enter summary disposition on count one in DHCA's favor.

## 2. CONFORMITY AND HARMONY REQUIREMENT (COUNT TWO)

DHCA next asserts defendants breached Article II's conformity and harmony requirement by installing the cedar siding, noting both its different look and its expert's statement that "untreated cedar is inconsistent with the classical English Tudor design and is not conforming with the other homes in Dearborn Hills." That may be, but Article II makes plain that the "conformity and harmony" requirement relates only to DHCA's review obligations, and nothing more. That is, DHCA must review plans proposing to "alter" structures "for conformity and harmony of external design with existing structures." Here defendants make no claim that DHCA's review and subsequent non-approval was somehow rooted in an erroneous conformity-and-harmony conclusion. This fact renders distinguishable DHCA's reliance on one of its other efforts to enforce the deed restrictions, in which the DHCA found the homeowners' use of stone "failed to conform and harmonize with the other houses in the subdivision" and the homeowners challenged that conclusion on appeal. See *Dearborn Hills Civic Ass'n, Inc, v Merhi*, unpublished per curiam opinion of the Court of Appeals, issued April 28, 2022 (Docket No. 354905), p 13-16. So even if the trial court was wrong in concluding there existed no evidence concerning conformity and harmony (and relatedly setting aside DHCA's expert affidavit for want of signature) as DHCA insists, this Court "will not reverse a trial court's decision when it reaches the right result, even if it was for the wrong reason." *Bailey v Antrim Co*, 341 Mich App 411, 420; 990 NW2d 372 (2022).

For these reasons, the trial court correctly granted summary disposition on this claim in defendants' favor.

## B. ARTICLE VI'S REASONABLE PROMPTNESS REQUIREMENT (COUNT FOUR)

Turning next to the length of time the cedar was on defendants' house, DHCA contends the trial court erroneously dismissed its Article VI claim because defendants started their siding project in March 2021 and did not remove the cedar siding until August 2022, thus violating Article VI's "reasonable promptness" requirement as well as its requirement to complete construction

within four months to repair damage caused by "fire or other casualty." Article IV's plain language forecloses these readings.

Begin with the "reasonable promptness" requirement. The trial court concluded "[t]here was no construction to complete with reasonable promptness . . . because Defendants' [application to DHCA] was never approved," highlighting that defendants "honor[ed] the cease and desist issued by DHCA" and thus withheld completion of the project. This conclusion comports with Article VI's "reasonable" restrictions, and DHCA cites no record facts undermining the conclusion that the decision to pause all activities in the face of litigation was somehow unreasonable. Nor are we persuaded that we should read anything into it taking less than a day to remove the cedar siding, for Article VI mandates that the construction "be carried forward to completion with reasonable promptness" and thus does not apply to DHCA's revert-to-how-it-was argument.

As for DHCA's "fire or other casualty" argument, that too is without merit. DHCA contends this provision applies because woodpeckers damaged the siding, constituting a "casualty." We disagree. The deed restrictions do not define "casualty," but its context—"fire or other casualty"—gives it meaning. See *Bloomfield Estates*, 479 Mich at 215 ("[U]nder the doctrine of *noscitur a sociis*, 'a word or phrase is given meaning by its context and setting.' " (citation omitted)). Casualty must thus be read as an accidental event and not one covering over-time, normal wear-and-tear like damaged siding due to wood rot or woodpeckers.

## C. DEED RESTRICTION REMEDIES

That leaves us with DHCA's request for us to grant it declaratory relief, monetary (or even nominal) damages, and attorney fees. Because the trial court erroneously granted summary disposition on count one and because "we are a court of review, not first view," *Cutter v Wilkinson*, 544 US 709, 718 n 7; 125 S Ct 2113; 161 L Ed 2d 1020 (2005), we will leave it to the trial court on remand to consider the remedies to which DHCA may be entitled.

## IV. DHCA'S REMAINING CLAIMS

We turn next to DHCA's remaining claims that it has appealed: breach of contract (count five) and fraud (count seven). We again review de novo, *Jostock*, 513 Mich at 368, and, like the trial court, consider them together. DHCA premises its contract claim on defendants' submission of an "Architectural Plan Review Request Form," which DHCA uses for homeowners "to request the approval of [certain] alterations to lots or to the exterior of structures." As part of that form, defendants agreed to the following language: "Owner acceptance and assurance to fully comply with the DHCA approved plans and any conditions of approval: I (we) agree to complete the proposed project in full accord to the DHCA approved plans, including any stated conditions for that approval." DHCA claims defendants breached this commitment by backing out on their proposed siding replacement project. But as the trial court appropriately reasoned when it granted summary disposition in defendants' favor on this claim, that "contract" spoke of post-approval terms and did not reflect mutuality of agreement, impose any obligation prior to approval, or include consideration—each of which are required elements to form a contract. See *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). And because there was no contract, DHCA's fraud claim—based on the contract (that defendants entered into the agreement to induce DHCA to expeditiously approve the plans without any intent to abide by DHCA's conditions)—

is similarly without merit. See generally *Huron Tool and Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 373; 532 NW2d 541 (1995) ("[M]isrepresentations relat[ing] to the breaching party's performance of the contract . . . do not give rise to an independent cause of action in tort.").

## V. DHCA'S REQUEST FOR ATTORNEY FEES

Finally, DHCA contends that the counterclaims were frivolous and thus requests approximately $2,500 in attorney fees as a sanction under MCR 1.109(E)(6). But based on our review of the record, we see nothing establishing that defendants' attorney failed to conduct a "reasonable" inquiry before signing the counterclaims pleading as required for sanctions under MCR 1.109(E)(6). We therefore affirm the trial court's denial of DHCA's request for attorney fees.

## VI. CONCLUSION

For these reasons, we vacate in part, affirm in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Randy J. Wallace
/s/ Christopher M. Trebilcock